|  |  |  |
|---|---|---|
| ANNA JAQUES HOSPITAL, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 13-0053 (ABJ) |
| KATHLEEN SEBELIUS,<br>*Secretary of the U.S. Dept. of*<br>*Health and Human Services*, | ) ) ) ) ) | |
| Defendant. | ) ) | |

# MEMORANDUM OPINION

Forty-one hospitals have sued the Secretary of the United States Department of Health and Human Services ("HHS") challenging her calculation of the "wage index" for their geographic area under the Medicare Act. Specifically, they complain that the Secretary improperly included two hospitals located outside their geographic area, the Boston-Quincy Core-Based Statistical Area ("CBSA"), when calculating the wage index for that CBSA for fiscal years ("FY") 2006 and 2007. This resulted in lower Medicare payments to the plaintiffs for those years.

Because the Medicare Act does not unambiguously set forth how HHS must define "geographic area" or what data it must use in calculating a geographic area's wage index and the Secretary's calculation of the wage index for the Boston-Quincy CBSA for those two years is reasonable, the Court will uphold the agency's calculation of the index for FY 2006 and 2007.

## I. BACKGROUND AND STATUTORY FRAMEWORK

The federal Medicare program provides healthcare coverage to individuals who are at least 65 years old and eligible for Social Security benefits, among others. 42 U.S.C. § 402 (2012). Under the program, the federal government reimburses healthcare providers for the services they provide to Medicare enrollees. *See id.* § 1395ww(d). HHS administers the program.[1] *See id.* §§ 1395h, 1395u.

HHS pays hospitals for acute inpatient care they provide to Medicare enrollees under the Prospective Payment System ("PPS"). *Id.* § 1395ww(d). Rather than pay hospitals for the actual costs they incur in providing care to particular Medicare enrollees, PPS pays hospitals a fixed, predetermined amount based on each patient's category of illness. *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 401 (D.C. Cir. 2005). These categories are called Diagnostic Related Groups or DRGs. *See generally* 42 U.S.C. § 1395ww. Under PPS, HHS constructs a standard nationwide cost rate, the "federal rate," based on the average operating costs of inpatient hospital services, then assigns a weight to each DRG category of inpatient treatment. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994). HHS determines a hospital's final reimbursement per patient by multiplying the patient's DRG by the federal rate, after that rate has been "standardized" by making adjustments based on a variety of factors. *St. Michael's Med. Ctr. v. Sebelius*, 648 F. Supp. 2d 18, 20 (D.D.C. 2009), citing 42 U.S.C. § 1395ww(d)(2)(C).

### A. The Wage Index

Because a significant component of hospitals' costs are attributable to wages and wage-related costs, *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 2 (D.C. Cir. 2009), and these costs vary

---

[1] The Center for Medicare and Medicaid Services ("CMS"), which is part of HHS, is responsible for reimbursing providers. *See* 42 U.S.C. §§ 1395h, 1395u.

widely across geographic areas, the Medicare statute provides adjustments to DRG payments to address these wage variations. *Methodist Hosp. of Sacramento*, 38 F.3d. at 1227, citing 42 U.S.C. § 1395ww(d)(2)(H). The statute requires the Secretary to

> adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the DRG prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level.

42 U.S.C. § 1395ww(d)(3)(E)(i); *see also Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 276 (3d Cir. 2002) (internal citation omitted) ("The wage index compares the average hourly wage for hospitals in a given geographic area with the national average hourly wage, which in turn determines the payment rate above or below the national average at which a hospital is reimbursed. The wage-index for an area generally applies to all hospitals physically located within that geographic area.").

Congress requires the Secretary "at least every 12 months . . . [to] update the factor . . . on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs" of the hospitals. 42 U.S.C. § 1395ww(d)(3)(E)(i). The Secretary conducts this survey by compiling wage data from cost reports submitted annually by hospitals. *Anna Jaques Hosp.*, 583 F.3d at 3, citing Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48,916, 49,049 (Aug. 11, 2004). The Secretary removes data from the survey that fail to meet certain criteria for reasonableness, including incomplete, inaccurate, or otherwise aberrant data, and calculates each area's wage index, which is then made available for public comment. *Id.* "Because of the time required to scrub the data, the Secretary calculates each year's wage index using data from the survey conducted three years earlier." *Id.*

B.     **The Geographic Area**

Before October 2004, HHS used Metropolitan Statistical Areas ("MSAs") to set the geographic boundaries for calculating the wage index of geographical areas under the statute. Medicare Program; Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,766 (Sept. 1, 1983). The Office of Management and Budget developed MSAs for use throughout the federal government, and although MSAs were not created for the specific purpose of calculating wage differences for Medicare payments, HHS's use of them for that purpose has been upheld. *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 169 (2d Cir. 2006). On October 1, 2004, though, the Office of Management and Budget redefined MSAs using CBSAs, which resulted in redrawing the boundaries of the geographic areas HHS used to calculate the wage index. Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. [Dkt. # 17] ("Pls.' Mem.") at 4–5, citing 69 Fed. Reg. at 49,026; *see also* Medicare Program; Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 28,196, 28,248–52, 28,321 (May 18, 2004); 69 Fed. Reg. at 49,034, 49,077.

Tobey Hospital, St. Luke's Hospital, and Charlton Hospital, all located in southeastern Massachusetts, merged in 1996 to form the Southcoast Hospital Group. AR 000003.[2] When they merged, Southcoast adopted the Medicare provider number of Tobey Hospital for the group. AR 000003; AR 000312. Tobey Hospital is the smallest of the three hospitals, comprising only ten percent of Southcoast Hospital Group's beds. Pls.' Opp. to Def.'s Cross-Mot. for Summ. J. and Reply to Def.'s Opp. to Pls.' Mot. for Summ. J. [Dkt. # 22] ("Pls.' Reply") at 4. All three hospitals were located in the Boston-Quincy MSA. When CBSAs replaced MSAs in 2004,

---

2     Defendant filed the administrative record for this case on May 17, 2013. *See* Notice of Filing of Administrative Record [Dkt. # 14]. When referring to a document in the administrative record, the Court will use "AR" and the Bates number of the document.

Tobey Hospital remained in the Boston-Quincy CBSA, but St. Luke's Hospital and Charlton Hospital became part of neighboring Providence-New Bedford-Falls River CBSA. AR 000006; AR 000310–12.

### C. The Policy on the Wage Costs of Hospital Groups

Under Medicare regulations, HHS treats multi-facility groups as a single entity. These groups submit a single cost report for the set of facilities under the group's principal provider number. Def.'s Mot. for Summ. J. and Mem. in Supp. of Def.'s Summ. J. Mot. and in Opp. to Pls.' Summ. J. Mot. [Dkt. # 19] ("Def.'s Mot./Opp.") at 5, citing PRM-II § 112, *available at* http://www.cms.gov/regulations-and-guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021935.html?DLPage=1&DLSort=0&DLSortDir=ascending, and Medicare State Operations Manual § 2779F, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS1201984.html (edits in original) ("[I]f the merged facilities operate as a single institution, it must submit a single cost report . . . . [I]n the case of the merger of 2 provider corporations, use[] the CNN [CMS Certification Number] of the surviving corporation and retire[] the other number or numbers."); *see also* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates, 70 Fed. Reg. 47,278, 47,444 (Aug. 12, 2005); Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates, 72 Fed. Reg. 47,130, 47,317–20 (Aug. 22, 2007).

Because HHS treats hospital groups as a single entity and hospital groups submit a single cost report, HHS adopted a policy starting in FY 2006 to attribute all the wage costs of a hospital group to the CBSA where the facility with the principal provider number is located. 70 Fed. Reg. at 47,444. It explained that:

> [S]ection 2779F of the Medicare State Operations Manual provides that, in the case of a merger of hospitals, if the merged facilities operate as a single institution, the institution must submit a single cost report, which necessitates a single provider identification number. This provision does not differentiate between merged facilities in a single wage index area or in multiple wage index areas. As a result, the wage index data for the merged facility is reported for the entire entity on a single cost report.

*Id.*; *see also* 72 Fed. Reg. at 47,317 (recognizing that the policy "may not allocate wage data with exact precision" but explaining that the Medicare cost report, "in its current form, does not enable a multicampus hospital to separately report its costs by location. The fact that a multicampus hospital submits a single cost report reflects that it is an integrated institution with one accounting structure"). Because Southcoast Hospital Group adopted Tobey Hospital's provider number for the group, HHS included the wages of all three Southcoast hospitals in calculating the FY 2006 and FY 2007 wage index for the Boston-Quincy CBSA – even though St. Luke's and Charlton were located in the Providence-New Bedford-Falls River CBSA.

Beginning with FY 2008, HHS announced a change in its policy that would provide for the allocation of each hospital group member's costs to the CBSA where its campus is located. 72 Fed. Reg. at 47,317. It proposed three alternative methods of apportioning wage costs and considered public comments on the alternatives. Some commentors favored apportionment as a means of providing more accuracy, and some expressed concern that apportionment would be extremely burdensome to hospitals. HHS ultimately decided to use FTE (full time employee) or Medicare discharge data to allocate salaries and hours to the campuses of multi-campus hospitals located in different geographic areas. *Id.* This change eliminates the problem complained of in this case for the future, but it has not been applied retroactively to FY 2006 and 2007.

Plaintiffs challenge HHS's inclusion of St. Luke's and Charlton's costs in calculating the wage index for the Boston-Quincy CBSA for FY 2006 and 2007. Pending before the Court are

6

the parties' cross-motions for summary judgment. *See* Pls.' Mot. for Summ. J. [Dkt. # 16]; Def.'s Mot./Opp.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the Administrative Procedure Act ("APA"), Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985), citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5.U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedures required by law," *id.* § 706(2)(D); *see also* 42 U.S.C. § 1395oo(f)(1). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision is presumed to be valid. *See Citizens to Preserve Overton Park*, 401 U.S. at 415. Also, a court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. A court must be satisfied, however, that the agency has examined the relevant data and articulated a

satisfactory explanation for its action, "including a 'rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006), quoting *State Farm*, 463 U.S. at 43.

In reviewing an agency's interpretation of a statute, courts use the two-step analysis outlined in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Step one involves determining whether Congress has spoken directly to the "precise question at issue," for if it has, then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If it has, then that is the end of the matter. *Id.*; *Nat'l Treasure Emps. Union v. Fed. Labor Relations Auth.*, 392 F.3d 498, 500 (D.C. Cir. 2004). However, if the statute is silent or ambiguous on the question (*Chevron* "step two"), "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The agency's interpretation only needs to be reasonable to warrant deference. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991).

"[I]n framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute. That complexity adds to the deference which is due to the Secretary's decision." *Methodist Hosp. of Sacramento*, 38 F.3d at 1229 (giving heightened deference to the Secretary's policy of denying retroactive effect to a revised wage index); *see also Robert Wood Johnson*, 297 F.3d at 282 (edits in original), quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("The broad deference of *Chevron* is even more appropriate in cases that involve a 'complex and highly technical regulatory program,' such as Medicare, which 'require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns.'").

## III. ANALYSIS

Plaintiff hospitals contend that HHS's calculation of the Boston-Quincy CBSA wage index for FY 2006 and 2007 violates the clear terms of the statute and is arbitrary and capricious.

### A. The Statute Does Not Clearly Address How the Agency Must Calculate the Wage Index for a Geographic Area

The Medicare statute requires the Secretary to adjust payments to hospitals to account for area differences in hospital wage levels "by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E)(i). Plaintiffs emphasize the term "geographic area" in this provision and argue that the statute speaks directly and unambiguously to the issue before the Court. Pls.' Mem. at 9–10. They contend that once the Secretary has exercised her discretion in defining a geographic area under this provision, the Secretary must apply that same definition in determining which hospitals' data are used to calculate the wage index for that area. *Id.* at 10. In other words, the Secretary cannot define a geographic area to include certain hospitals, but then use the costs of hospitals outside that area to calculate the area's wage index. Defendant does not dispute that the wage index must reflect the relative hospital wage level "in the geographic area of the hospital" compared to the national average. Def.'s Reply to Pls.' Opp. to Def.'s Cross-Mot. for Summ. J. [Dkt. # 25] ("Def.'s Reply") at 2. But, according to defendant, the statute does not speak directly to the issue here because it is silent as to "which precise data the Secretary must use in calculating the wage index." Def.'s Mot./Opp. at 12. That is, the statute does not provide *how* the Secretary must carry out the mandate in section 1395ww(d)(3)(E)(i). Def.'s Reply at 2.

The Court agrees with defendant. The text of the statute does not support plaintiffs' argument because it does not clearly speak to the issue. First, the term "geographic area" –

9

especially as it is used broadly here to differentiate the area around a hospital from the whole nation – is not a term of art, but it is ambiguous, and the statute leaves it to the agency's discretion to define geographic areas in calculating the wage index. *See Bellevue Hosp. Ctr.*, 443 F.3d. at 175 ("[T]he statute leaves considerable ambiguity as to the term 'geographic area,' which, based only on the literal language of the provision, could be as large as a several-state region or as small as a city block."). And though the requirement to create an index that reflects the relative wage level "in the geographic area" could be read to imply that an area's wage index can include the wages only of hospitals in that area, the statute does not clearly provide that. *Methodist Hosp. of Sacramento*, 38 F.3d at 1230 (noting that "[t]he statute does not specify how the Secretary should construct the index . . . . Congress through its silence delegated these decisions to the Secretary," and that the statute "merely requires the Secretary to develop a mechanism to remove the effects of local wage differences"); *see also Anna Jaques Hosp.*, 583 F.3d at 5–6 (upholding HHS policy to remove certain aberrant data from the wage calculation index, in part, because the statute is silent about whether the agency must use all of survey data it receives in calculating the wage index). Rather, the statute expressly leaves the wage index calculation to the agency. 42 U.S.C. § 1395ww(d)(3)(E)(i) (requiring the Secretary to adjust for area wage differences by a factor "established by the Secretary"). Further, the wage index is not required to reflect the exact wage differences among geographic areas; it is only required to approximate those differences. *See Methodist Hosp. of Sacramento*, 38 F.3d at 1230 ("Because the index is based on available wage data from past years, at any given time the wage index must reflect the Secretary's best approximation of relative regional wage variations.")

The court in *St. Michael's Medical Center v. Sebelius* considered a question similar to the one before this Court: whether HHS's policy of calculating the wage index for urban areas

excluding data from hospitals that had reclassified into those urban areas under section 1395ww(d)(8)(B)(i) violated section 1395ww(d)(3)(E), the provision at issue here. 648 F. Supp. 2d 18. The Medicare statute allows a hospital to seek reclassification from its geographically-based wage area to a nearby wage area for payment purposes if it meets certain criteria, because the geographic classification procedures can impose a burden on some hospitals – like those in rural areas that compete for employees with hospitals in nearby urban areas. *Id.* at 20 n.3, 21, citing section 1395ww(d)(8)(B)(i) and *Robert Wood Johnson*, 297 F.3d at 276. For FY 2000 and 2001, HHS did not include the cost data of hospitals that had been reclassified under section 1395ww(d)(8)(B)(i) into an urban MSA in calculating the wage index for the MSA.[3] The question before the court was whether section 1395ww(d)(E)(3) required HHS to include those costs because those hospitals had been reclassified into the "geographic area." The court held it did not. It ruled that section 1395ww(d)(3)(E) "leave[s] open the question of whether a hospital should be treated as located 'in the geographic area' from which it has reclassified." *St. Michael's Med. Ctr.*, 648 F. Supp. 2d at 27.

Although *St. Michael's* involves a different policy and concerns hospitals reclassified under a specific statutory provision, the Court finds that the court's underlying analysis applies equally here: section 1395ww(d)(3)(E) leaves open the question of how HHS must treat the costs of a hospital group when its individual hospitals are located in more than one geographic area. Accordingly, the Court must turn to step two of the *Chevron* analysis and determine if the agency's interpretation of the statute is reasonable.

---

3   The agency changed this policy in 2002 and began including the wage data of reclassified hospitals in both the MSA to which these hospitals were reclassified and in the MSA where the hospital is physically located. *St. Michael's Med. Ctr.*, 648 F. Supp. 2d at 22.

## B. The Agency's Interpretation of the Wage Index Provision is Reasonable

When a statute is silent or ambiguous with respect to an issue, courts must consider whether an agency's interpretation of the statute is "arbitrary, capricious, or an abuse of discretion." 5 U.S.C. § 706(2)(A). Plaintiffs argue that it was arbitrary and capricious for the Secretary to include cost data from St. Luke's and Charlton, located outside the Boston-Quincy CBSA, to calculate the wage index for the Boston-Quincy CBSA. First, they point out that in FY 2006, HHS paid St. Luke's and Charlton the wage index applicable to the Providence-New Bedford-Falls River CBSA while including their costs in calculating the Boston-Quincy CBSA wage index. Pls.' Mem. at 11–12; Pls.' Reply at 7. But how the agency treated the Southcoast hospitals for payment purposes does not dictate how it was required to treat them for purposes of calculating the Boston-Quincy CBSA wage index. These circumstances are governed by different provisions of the statute. *See* 42 U.S.C. § 1395ww(d)(8)(B)(i) (governing payments to reclassified hospitals); § 1395ww(d)(3)(E)(i) (governing creation of the wage index). *See also St. Michael's Med. Ctr.*, 648 F. Supp. 2d at 27 (upholding HHS's practice of calculating the wage index under section 1395ww(d)(3)(E) for urban areas without including data from hospitals that had been reclassified into the areas for payment purposes).

Next, plaintiffs emphasize the fact that, in 2008, the Secretary began treating multi-campus hospitals the way they contend is required here. Pls. Mem. at 12. The fact that the agency changed its policy does not, however, make the initial policy unreasonable. *Chevron*, 467 U.S. at 863–64 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."); *see also Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) ("Of course the mere fact that an agency interpretation contradicts a prior agency position is not fatal."); *ILGWU v. Donovan*, 722 F.2d 795, 814 n.33 (D.C. Cir.

1983) ("Agencies remain free to react to new information as part of their standard regulatory procedure . . . ."). Indeed, the D.C. Circuit has specifically noted that the agency may appropriately consider the importance of finality when deciding whether to apply a change to a wage index calculation retroactively. *See Methodist Hosp. of Sacramento*, 38 F.3d at 1235 (upholding the agency's policy to apply corrections to a hospital's cost reports prospectively but not retroactively, in part, because the policy was a reasonable choice between the competing values of finality and accuracy). Here, HHS carefully considered how to treat the costs of hospital groups with hospitals in more than one CBSA given the data available to it at the time,[4] and it provided rational reasons for deciding to attribute the costs of the hospital group as a whole into the CBSA where the facility with the principal provider was located. *See* 70 Fed. Reg. at 47,444; *see also* 72 Fed. Reg. at 47,317–20. As events unfolded and it continued to refine its position, the agency subsequently evaluated various methods for allocating the costs of facilities of a single hospital group across multiple CBSAs, considered comments on the issue, and determined to change its policy, providing coherent and valid reasons for doing so. *See* 72 Fed. Reg. at 47,317–20.

Plaintiffs further argue that HHS's policy was arbitrary and capricious because including St. Luke's and Charlton's costs in the Boston-Quincy CBSA calculation undermined the requirement that the agency create "a uniform picture of area wage levels." Pls.' Mem. at 12–13. They contend that "uniformity is compromised by inconsistent treatment of wage data across providers." *Id.* at 12, citing *Centra Health, Inc. v. Shalala*, 102 F. Supp. 2d 654 (W.D. VA 2000) and *Sarasota Mem'l Hosp. v. Shalala*, 60 F.3d 1507 (11th Cir. 1995). But here, HHS treated

---

[4] Defendant asserts, and the record indicates, that HHS did not have cost data of hospital groups separated by individual campuses, so it "had no means to separate out the separate wage data for each of the three hospitals." Def.'s Reply at 4; *see also* Letter from Keith D. Barber, counsel for plaintiffs, to Michael W. Harty, Chairman, Provider Reimbursement Review Board (Oct. 23, 2012) at AR 000014 ("At the time of the establishment of the FFY 2006 and FFY 2007 wage indexes, there was no mechanism by which Southcoast could separate the data for its campuses in the Providence-New Bedford-Fall River, RI-MA CBSA.").

wage data consistently across providers. For the FY 2006 and 2007, the cost data of all multi-campus hospitals with locations in multiple CBSAs were treated the same.

Further, the two cases plaintiffs rely on, *Centra Health, Inc. v. Shalala* and *Sarasota Memorial Hosp. v. Shalala*, are distinguishable. Plaintiffs in *Centra Health* challenged HHS's inclusion of cost data from skilled nursing facilities in calculating the wage index for plaintiffs' MSA, when the statute expressly required the agency to exclude that data "[t]o the extent determined feasible by the Secretary." 102 F. Supp. 2d at 658, quoting 42 U.S.C. § 1395ww(d)(3)(E) (emphasis omitted). The *Centra Health* court determined that it was feasible for HHS to exclude the data in that case and held that HHS should have done so. Here, there is no analogous provision requiring the Secretary to add or remove wage data of individual hospitals that are part of a group with campuses in multiple CBSAs when calculating the wage index of a geographic area.

*Sarasota Memorial Hospital* concerned how the agency treated plaintiff Sarasota Memorial's payments of its employee's portion of Federal Insurance Contributions Act ("FICA") taxes in calculating the wage index. Because Sarasota Memorial paid its employees' portion of FICA taxes, instead of the employees paying them from their gross wages, HHS treated these payments as fringe benefits, excluding them from Sarasota Memorial's wage costs when it calculated the Sarasota MSA's wage index. For other hospitals, however, HHS treated the employee portion of FICA taxes paid by employees as wages, including them in those hospitals' wage costs. The Eleventh Circuit ruled there was no reasonable basis for classifying the same FICA payments as wages when paid by the employee but as fringe benefits when paid by the employer, citing the FICA statute which excluded employer-paid employee FICA taxes from the definition of wages only for purposes of calculating FICA taxes and noting that the

14

agency did not explain why the FICA payments were not considered salary or wages in the first place. *Sarasota Mem'l Hosp.*, 60 F.3d at 1512, citing 26 U.S.C. § 3121(a)(6). The instant case is distinguishable because it does not involve HHS treating the same costs differently across providers, there is no statutory provision addressing the issue, and the agency here provided a reasonable and detailed explanation for its policy decision for FY 2006 and 2007.

Finally, plaintiffs point out that "CMS's task is unambiguous: to calculate a factor that reflects geographic-area wage-level differences, and nothing else." Pls. Mem. at 13, quoting *Bellevue Hosp. Ctr.*, 443 F.3d at 174. But plaintiffs fail to quote the rest of the *Bellevue* opinion, which holds that because "the statute leaves considerable ambiguity as to the term 'geographic area,' . . . the agency has considerable discretion." *Bellevue Hosp. Ctr.*, 443 F.3d at 175. As discussed above, the statute similarly leaves open the question of how the agency must calculate the wage index, leaving the agency to determine how to account for the costs of a hospital group with hospitals located in more than one geographic area.

Given this, the Court holds that it was not arbitrary and capricious for the Secretary to include the wage costs of St. Luke's Hospital and Charlton Hospital in calculating the wage index of the Boston-Quincy CBSA for FY 2006 and 2007.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment will be denied and defendant's cross-motion for summary judgment will be granted. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 31, 2014